Linda **SARSOUR, et al., Plaintiffs,**

v.

Donald J. **TRUMP, et al., Defendants.**

**Civil Action No. 1:17cv00120 (AJT/IDD)**

United States District Court,
E.D. Virginia,
Alexandria Division.

Signed 03/24/2017

Gadeir Ibrahim Abbas, The Law Office of Gadeir Abbas, Washington, DC, for Plaintiffs.

Dennis Carl Barghaan, Jr., United States Attorney's Office, Alexandria, VA, for Defendants.

## MEMORANDUM OPINION

Anthony J. Trenga, United States District Judge

Presently pending before the Court is Plaintiffs' "Emergency Motion for Temporary Restraining Order and/or Preliminary Injunction" [Doc. No. 13] (the "Motion"). The Court held a hearing on the Motion on March 21, 2017, following which it took the Motion under advisement. Upon consideration of the Motion, the memoranda in support thereof and in opposition thereto, the arguments of counsel at the hearing held on March 21, 2017, and for the reasons set forth below, the Motion is DENIED.[1]

## I. BACKGROUND

The Plaintiffs seek an emergency order enjoining the enforcement of Executive Order 13,780 ("EO–2" or the "Order"), issued by President Donald J. Trump ("President Trump" or the "President") on March 6, 2017 and scheduled to go into effect on March 16, 2017. Subject to a number of enumerated limitations, exemptions, and waivers, the Order suspends entry into the United States by nationals of six countries for 90 days and by all refugees for 120 days. EO–2 explicitly rescinds Executive Order 13,769 ("EO–1"), which similarly temporarily barred nationals from certain countries from obtaining visas or entering the United States but did not contain the exemptions and waivers now in EO–2 and also included certain religious preferences no longer in EO–2.

The ultimate issue in this action is whether the President exceeded his authority, either as delegated to him by Congress or as provided by the Constitution. But because Plaintiffs seek at the beginning of this case the relief they would ultimately obtain at the end of the case should they prove successful, Plaintiffs must show not only that (1) they are likely to succeed on the merits of their claim that EO–2 exceeded the President's authority, but also that (2) without immediate injunctive relief, Plaintiffs face imminent irreparable harm; (3) the balance of equities, including the balance of hardships, weigh in their favor; and (4) issuance of the requested injunction on an emergency ba-

---

1. Both parties have urged the Court to decide the Motion on the merits. In particular, the Plaintiffs claim that given the nature of their Establishment Clause injuries, the harm inflicted by EO–2 is not confined to any particular provision and persists so long as any of its provisions continue to operate. Given the nature of Plaintiffs' claims, the temporary and limited nature of the injunctions already issued, and the facts that appear to be particular to these Plaintiffs, the Court concludes that there remains a justiciable controversy ripe for adjudication and will therefore decide the Motion on its merits.

sis is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).

### A. Factual History

#### 1. Executive Order No. 1

On January 27, 2017, President Trump issued Executive Order 13,769, titled "Protecting the Nation from Foreign Terrorist Entry into the United States," 82 Fed. Reg. 8977 (Jan. 27, 2017). EO–1 immediately suspended immigrant and nonimmigrant entry into the United States for 90 days to aliens from Iraq, Iran, Libya, Sudan, Somalia, Syria, and Yemen. EO–1 also suspended the U.S. Refugee Admissions Program ("USRAP") for 120 days, *id.* § 5(a), and suspended the entry of all refugees from Syria indefinitely, *id.* § 5(c). Furthermore, in screening refugees, government bodies were directed "to prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality." *Id.* § 5(b). The order provided for "case-by-case" exceptions to the 120–day refugee suspension. *Id.* § 5(f).

A group of plaintiffs including the State of Washington and the State of Minnesota challenged EO–1 on both constitutional and statutory grounds in the United States District Court for the Western District of Washington. *See Washington v. Trump*, No. C17-0141JLR, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017). On February 3, 2017, the district court issued a nationwide injunction halting enforcement of the operative portions of that order, although it did not provide a specific basis for finding that the plaintiffs were likely to succeed on the merits. *Id.* On February 9, 2017, the United States Court of Appeals for the Ninth Circuit denied the defendants' emergency appeal to stay the district court's order, which it construed as a preliminary injunction. *Washington v. Trump*, 847 F.3d 1151, 1165–66 (9th Cir. 2017). The Ninth Circuit found that the defendants had not demonstrated a likelihood of success on the merits as to the plaintiffs' procedural due process claim, but it reserved judgment on the plaintiffs' Establishment Clause and Equal Protection Clause claims, noting that they "raise[d] serious allegations and present[ed] significant constitutional questions." *Id.* at 1168.

Separately, on February 13, 2017, this Court enjoined the enforcement of section 3(c) only as to Virginia residents and students enrolled in state educational institutions located in the State of Virginia. *Aziz v. Trump*, No. 1:17–cv–116, 234 F.Supp.3d 724, 2017 WL 580855 (E.D. Va. Feb. 13, 2017) (Brinkema, J.). This Court ruled that the plaintiffs had clearly demonstrated a likelihood of success on the merits of their Establishment Clause claim, but it did not address their other claims. That injunction has not been appealed.

#### 2. Executive Order No. 2

Responding to the successful legal challenges to EO–1, on March 6, 2017, President Trump issued EO–2. EO–2 explicitly rescinds EO–1 and was scheduled to go into effect on March 16, 2017 at 12:01 a.m. EDT. EO–2 has the same title as EO–1 and has many of the same stated policies and purposes. It also has substantial differences, as discussed in detail below. Briefly summarized, EO–2 removes Iraq from the list of designated countries whose nationals are covered by the Order, eliminates the indefinite suspension of all refugees from Syria, exempts otherwise covered persons who are located in the United States or who had appropriate travel documents as of the date on which EO–1 was issued, provides a list of categories where otherwise covered persons qualify for consideration of a waiver, and removes any religious-based preferences for waivers. The Order also contains substantially more justification for its national security con-

cerns and the need for the Order, including why each particular designated country poses specific dangers.

Before the Order's effective date, the State of Hawaii and a United States citizen challenged the Order in the United States District Court for the District of Hawaii. On March 15, 2017, the Hawaii court issued a nationwide temporary restraining order ("TRO") enjoining the enforcement of sections 2 and 6 of EO–2. *Hawai'i v. Trump,* No. 1:17-cv-00050, 241 F.Supp.3d 1119, 2017 WL 1011673 (D. Haw. Mar. 15, 2017). At the hearing in this action before this Court on March 21, 2017, Defendants represented that they expected the District of Hawaii court to extend the TRO, with their consent, until that court decides the pending motion for a preliminary injunction, a hearing on which has been scheduled for March 29, 2017.[2] The TRO has not been appealed.

A separate group of six individuals and three organizations challenged EO–2 in the United States District Court for the District of Maryland, alleging that it inflicted stigmatizing injuries as well as various other more particularized forms of harm. In an order signed on March 15, 2017 but entered on March 16, 2017, the Maryland court issued a nationwide preliminary injunction enjoining the enforcement of section 2(c) of EO–2. *Int'l Refugee Assist. Proj. v. Trump,* No. 8:17-cv-00361-TDC, 241 F.Supp.3d 539, 2017 WL 1018235 (D. Md. Mar. 16, 2017).

Litigation in the Western District of Washington also continues. In that case, Plaintiffs filed an emergency motion to enforce the court's February 3, 2017 preliminary injunction of EO–1. The district court rejected that motion, finding that EO–2 did not violate the court's prior preliminary injunction because EO–2 is substantively different from EO–1. Order Denying Washington's Emergency Motion to Enforce the Preliminary Injunction, *Washington v. Trump,* No. C17–0141JLR, 2017 WL 1045950 (W.D. Wash. Mar. 16, 2017), ECF No. 163.

By way of summary, at this point, the District of Hawaii court's TRO remains in effect as to sections 2 and 6 of the Order until March 29, 2017, and the District of Maryland court's preliminary injunction remains in effect as to section 2(c) of the Order. All other sections of EO–2 are in force at this time. Plaintiffs in this litigation ask this Court to enjoin the enforcement of EO–2 in its entirety.

### B. Plaintiffs Who Move for Emergency Relief

All Plaintiffs are Muslims who are presently residing in various locations across the country and claim that they have been harmed by the issuance of EO–2 in a variety of ways. Among the injuries they allege is the harm created by a stigma against Muslims living in the United States. Specifically, they claim that as a result of Defendants' conduct, beginning with the initial announcement of the "Muslim Ban," Defendants have promoted views that (1) disfavor and condemn their religion of Islam; (2) marginalize and exclude Muslims, including themselves, based on the claim that Muslims are disposed to commit acts of terrorism; (3) endorse other religions and nonreligion over Islam; (4) Muslims are outsiders, dangerous, and not full members of the political community; and (5) all non-adherents of Islam are insiders and therefore favored. Amended Complaint [Doc. No. 11] ("AC") ¶¶ 20–38. In addition, Plaintiffs allege a range of

---

**2.** The TRO did not have an expiration date, but it will expire on March 29, 2017, unless extended. *See* Fed. R. Civ. P. 65(b)(2) ("The order expires at the time after entry—not to exceed 14 days—that the court sets...."). Where the court has not set a specific time of expiration, the order simply expires fourteen days after entry.

other injuries based on each's particular status in the United States and each's relationships with persons outside of the United States. The following eight Plaintiffs have joined in the Motion.[3]

Plaintiffs Basim Elkarra, Hussam Ayloush, and Adam Soltani are United States citizens who allegedly "are no longer able to bring their family members from Syria and Iran to visit them in the United States as a direct result of the Revised Muslim Ban [EO–2] as they otherwise would." Plaintiffs' Motion ("Pls.' Mot.") 6. They further allege that, as "prominent civil rights and grassroots activists," they "have had to change their conduct adversely in that they have been required to assist and advocate on behalf of Muslims targeted or stigmatized by the First Muslim Ban [EO–1], push back against the anti-Muslim sentiment fomented and legitimized by Defendants, and defend their religion as a religion of peace on national media outlets and through grassroots efforts." *Id.*

Plaintiff John Doe No. 6 is also a United States citizen. He recently filed a marriage petition for his Sudanese wife currently residing outside of the United States, which he claimed would be "subjected to a more onerous application process that will require her to make heightened showings to obtain a waiver from the Revised Muslim Ban [EO–2], pursuant to Sec. 3(c)(iv) of the Revised Muslim ban, based solely on her Sudanese national origin." *Id.* 6–7. That petition was approved while this Motion was pending, however, [*see* Doc. No. 31], and her visa application is now pending.

Plaintiffs John Doe Nos. 7 and 8 are lawful permanent residents of the United States. John Doe No. 7 is a Syrian national, and John Doe No. 8 is a Sudanese national. John Doe No. 7 filed a marriage petition for his wife, which is currently pending. John Doe No. 8 also filed a marriage petition for his wife, which was approved, but her visa application remains pending. These three Plaintiffs allege that under EO–2, "their wives' visa applications will be subject to a more onerous application process that will require [them] to make heightened showings to obtain a waiver from the Revised Muslim Ban." *Id.* 7.

Plaintiffs John Doe Nos. 2 and 3 are students of Somali and Yemeni national origin who were issued single-entry F–1 student visas which expire upon completion of their studies. They allege that they intended to travel outside of the United States but that, if they do so now, they "will be subjected to a more onerous application process that will require them to make heightened showings to obtain a waiver." *Id.* They claim that this inability to travel imposes a hardship because they are additionally deprived of the opportunity to see their families, and they may not be able to stay in student housing during school breaks. *Id.* 7–8.

### C. Procedural History

President Trump issued EO–1 on January 27, 2017. Three days later, on January 30, 2017, Plaintiffs filed their Complaint for Injunctive and Declaratory Relief [Doc. No.1] against President Trump, Secretary of the Department of Homeland Security John F. Kelly, the U.S. Department of State, and the Director of National Intelligence.[4] Then, on March 13, 2017,[5] after President Trump's March 6, 2017 issuance

---

**3.** Plaintiffs John Doe No. 5 is a Sudanese national and lawful permanent resident of the United States who initially joined in the presently pending Motion; however, on March 21, 2017, he withdrew his Motion. [Doc. No. 31.]

**4.** On February 3, 2017 and February 27, 2017, three separate motions to intervene were filed by *pro se* movants Janice Wolk Grenadier [Doc. No. 2], Raquel Okyay [Doc. No. 4], and Vincent A. Molino [Doc. No. 8].

of EO–2, which explicitly rescinded EO–1, Plaintiffs filed their Amended Complaint for Injunctive and Declaratory Relief [Doc. No. 11] as well as their presently pending "Emergency Motion for Temporary Restraining Order and/or Preliminary Injunction" [Doc. No. 13].

## II. LEGAL STANDARD

■ Federal Rule of Civil Procedure 65 authorizes federal courts to issue temporary restraining orders and preliminary injunctions. "The standard for granting either a TRO or a preliminary injunction is the same." *Moore v. Kempthorne*, 464 F.Supp.2d 519, 525 (E.D. Va. 2006) (citation omitted) (internal quotation marks omitted). Both are "extraordinary remedies involving the exercise of a very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola*, 245 F.3d 335, 339 (4th Cir. 2001). The movants bear the burden to establish that (1) they are likely to succeed on the merits of their case; (2) they are likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of the equities tips in their favor; and (4) an injunction would be in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); *Manning v. Hunt*, 119 F.3d 254, 263 (4th Cir. 1997); *see also Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013).

## III. ANALYSIS

### A. Standing

■ In order to obtain the requested injunction, Plaintiffs must first demonstrate that they have standing to challenge

EO–2. Defendants dispute that any of the Plaintiffs have standing. "Standing doctrine functions to ensure, among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 191, 120 S.Ct. 693, 145 L.Ed.2d 610. To establish standing, a plaintiff must set forth specific facts to demonstrate that (1) he has "suffered an 'injury in fact' . . . which is (a) concrete and particularized . . . and (b) 'actual or imminent, not conjectural or hypothetical"; (2) there exists "a causal connection between the injury and the conduct complained of"; and (3) "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations omitted). Plaintiffs must demonstrate standing for every claim, but a claim is justiciable if even only one Plaintiff has standing to raise it. *Bostic v. Schaefer*, 760 F.3d 352, 370–71 (4th Cir. 2014).

■ Because of the nature of Plaintiffs' statutory and constitutional claims, their showing of standing may be based on subjective, non-economic, or intangible injuries. *Suhre v. Haywood Cty.*, 131 F.3d 1083, 1086 (4th Cir. 1997) ("[R]ules of standing recognize that noneconomic or intangible injury may suffice to make an Establishment Clause claim justiciable."); *Moss v. Spartanburg Cty. Sch. Dist. Seven*, 683 F.3d 599, 605 (4th Cir. 2012) ("[P]laintiffs have been found to possess standing when they are 'spiritual[ly] affront[ed]' as a result of 'direct' and 'unwelcome' contact with an alleged religious es-

---

The Court denied each of these motions. [Doc. Nos. 5, 10.]

**5.** In their Motion, Plaintiffs incorrectly claim that they filed their Amended Complaint on March 10, 2017. *See* Def.'s Mot. 8. The

Amended Complaint is dated "March 13, 2017," *see* AC 53, and the Court's CM/ECF electronic case filing system also indicates that the document was electronically filed on March 13, 2017.

tablishment within their community." (quoting *Suhre*, 131 F.3d at 1086–87)); *Bostic*, 760 F.3d at 372 (Equal Protection Clause challenges, like Establishment Clause challenges, can be premised on "stigmatic injury stemming from discriminatory treatment."). However, the allegation of injury in the form of a stigma alone is insufficient to support standing; there must also be a "cognizable injury caused by personal contact [with the offensive conduct]." *Suhre*, 131 F.3d at 1090; *see also Moss*, 683 F.3d at 607 (finding standing where plaintiffs alleged "outsider" status after having received a letter from their school district promoting a "course of religious education [with] Christian content" and "prayers and other Christian references [at] school events").

█ In this case, all Plaintiffs claim that in addition to the stigma that the Order has imposed on them as Muslims, they have suffered "cognizable injury caused by personal contact" because EO–2 prevents or impermissibly burdens their ability to (1) reunite with their foreign national spouses or other relatives; (2) travel internationally without fear of forfeiting their own visas; (3) renew their visas without being subjected to a heightened standard of review; and (4) attend other life activities without the need to combat the pernicious effects of EO–2 through religious advocacy and outreach. Based on these alleged injuries and the facts that have been presented, the Court finds for the purposes of the Motion that Plaintiffs have made a sufficient showing that they have standing to challenge EO–2.

## B. Plaintiffs' Likelihood of Success on the Merits

Section 2(c) of EO–2 suspends the entry into the United States of nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen for 90 days, subject to the limitations, exemptions, and waivers in sections 3 and 12. Section 6 of EO–2 suspends decisions on applications for refugee status worldwide for 120 days, subject to waivers issued under section 6(c). Plaintiffs seek to enjoin EO–2 in its entirety on the grounds that all or parts of the Order exceed the President's statutory or constitutional authority and that, in any event, the Order, as a whole, has the unconstitutional effect of imposing upon them a stigma based on their status as Muslims.

█ "[A] party seeking a preliminary injunction...must clearly show that it is likely to succeed on the merits."[6] *Dewhurst v. Century Alum. Co.*, 649 F.3d 287, 290 (4th Cir. 2011). The "requirement...is far stricter than...[a] requirement that the plaintiff demonstrate only a grave or serious *question* for litigation." *Real Truth About Obama, Inc. v. F.E.C.*, 575 F.3d 342, 346–47 (4th Cir. 2009), *judgment vacated on other grounds*, 559 U.S. 1089, 130 S.Ct. 2371, 176 L.Ed.2d 764 (2010), and *adhered to in relevant part*, 607 F.3d 355 (4th Cir. 2010).[7] In determining whether the Plain-

---

6. Plaintiffs claim that "a showing of likelihood of success on the merits is required 'only if there is no imbalance of hardships in favor of the plaintiff.'" Pls.' Mot. 12 (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 808 (4th Cir. 1991)). After the Supreme Court's decision in *Winter* in 2008, the Fourth Circuit concluded that "[o]ur...standard in several respects [as stated in *Direx Israel, Ltd.*] now stands in fatal tension with the Supreme Court's 2008 decision in *Winter*....[T]he... balance-of-hardship test may no longer be applied in granting or denying preliminary injunctions in the Fourth Circuit." *Real Truth About Obama, Inc. v. F.E.C.*, 575 F.3d 342, 346–47 (4th Cir. 2009), *judgment vacated on other grounds*, 559 U.S. 1089, 130 S.Ct. 2371, 176 L.Ed.2d 764 (2010).

7. The Supreme Court vacated the Fourth Circuit's opinion in *Real Truth About Obama, Inc.* following its opinion in *Citizens United v. F.E.C.*, 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010), and remanded to the

tiffs have made the required showing, the issue is not whether EO–2 is wise, necessary, under- or over-inclusive, or even fair. It is not whether EO–2 could have been more usefully directed to populations living in particular geographical areas presenting even greater threats to national security or even whether it is politically motivated. Rather, the core substantive issue of law, as to which Plaintiffs must establish a clear likelihood of success, is whether EO–2 falls within the bounds of the President's statutory authority or whether the President has exercised that authority in violation of constitutional restraints.

### 1. Plaintiffs' Claim that EO–2 Violates the Immigration and Nationality Act (Count IV [8])

■ Plaintiffs claim that section 2(c) of EO–2 bars entry into the United States based on nationality and therefore violates the Immigration and Nationality Act of 1952 ("INA"), Pub. L. No. 82–414, 66 Stat. 163, 8 U.S.C. §§ 1101–1537 (2012). Plaintiffs argue that 8 U.S.C. § 1152(a)(1)(A) ("Section 1152") bars EO–2. Defendants claim that the President's broad authority under 8 U.S.C. § 1182(f) ("Section 1182(f)") to bar entry of "any aliens or class of aliens" is not restricted by Section 1152.[9]

Congress has the exclusive constitutional authority to create immigration policies. *See Galvan v. Press*, 347 U.S. 522, 531, 74 S.Ct. 737, 98 L.Ed. 911 (1954).[10] In exercising that authority, Congress has enacted (and repealed) a wide variety of immigration statutes over the years, with a wide variety of restrictions and authorizations. As a result, the current version of the INA, a comprehensive statute governing immigration and the treatment of aliens originally passed in 1952, is a legislative rabbit warren that is not easily navigated.

Section 1182(a)(3)(B) identifies those aliens seeking to enter the United States who are "inadmissible" because of certain identified activities related to terrorism. These aliens include, with certain exceptions, aliens who have engaged in "terrorist activities," are reasonably believed to be engaged or "likely to engage after entry in any terrorist activities," are representatives of a terrorist organization, endorse or espouses terrorist activities or persuade others to do so, have received military-type training from a terrorist organization, or are the spouses or children of an alien who is inadmissible. 8 U.S.C. § 1182(a)(3)(B)(i). "Terrorist activity" is defined broadly. *See id.* § 1182(a)(3)(B)(iii).

Fourth Circuit "for 'further consideration in light of *Citizens United* and the Solicitor General's suggestion of mootness.'" *Real Truth About Obama, Inc. v. F.E.C.*, 607 F.3d 355 (4th Cir. 2010) (quoting *Real Truth About Obama, Inc. v. F.E.C.*, 559 U.S. 1089, 130 S.Ct. 2371, 176 L.Ed.2d 764 (2010)). In a published order issued per curiam, the Fourth Circuit reissued Parts I and II of its earlier opinion, "stating the facts and articulating the standard for the issuance of preliminary injunctions," and remanded the case to the district court for further consideration in accordance with the Supreme Court's directive.

8. Plaintiffs' labelling of this claim as "Count V" in their Amended Complaint appears to be a typo, as there is no Count IV. *See* AC 50.

9. The Court will first assess Plaintiffs' statutory claims pursuant to its obligation to avoid constitutional rulings whenever possible. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.").

10. Defendants contend that the President has Article II authority, as well as statutory authority, to issue EO–2. Given the Court's ruling, there is no need to consider the merits of Defendants' Article II contentions.

In addition to the specific criteria for inadmissibility set forth in Section 1182(a)(3)(B), Section 1182(f), which was also passed in 1952, delegates broad authority to the President to bar entry into the United States of "any aliens or class of aliens." More specifically, Section 1182(f) provides that:

Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

*Id.* § 1182(f). 8 U.S.C. § 1185(a) ("Section 1185(a)"), passed in 1978, further delegates authority to the President:

Unless otherwise ordered by the President, it shall be unlawful for an alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe.

*Id.* § 1185(a)(1). President Trump relies explicitly on his authority under Section 1182(f) and Section 1185(a) to suspend the entry of all nationals from the six designated countries for 90 days as well as to suspend the entry of all refugees under the United States Refugee Admissions Program for 120 days. EO–2 §§ 2(c), 6.

In 1965, Congress amended the INA to prohibit certain types of discrimination in connection with the issuance of immigrant visas. Section 1152 provides:

No person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of his race, sex, nationality, place of birth, or place of residence.

8 U.S.C. § 1152(a)(1)(A). Plaintiffs rely centrally on this provision to argue that the President's exercise of his authority under Sections 1182(f) and 1185(a) is limited and restricted by the non-discrimination provision in Section 1152.

8 U.S.C. § 1201(h) ("Section 1201(h)") is also relevant. In pertinent part, it provides:

Nothing in [the INA] shall be construed to entitle any alien, to whom a visa or other documentation has been issued, to be admitted the United States, if, upon arrival at a port of entry in the United States, he is found to be inadmissible under this chapter, or any other provision of law.

*Id.* § 1201(h). So as to leave no doubt as to the scope of entitlement granted by the issuance of an immigrant visa, Congress mandated that the text of this provision "appear upon every visa application." *Id.*

Plaintiffs urge this Court to conclude that section 2(c) of EO–2 discriminates on the basis of nationality and is therefore prohibited by Section 1152. Plaintiffs argue in this regard that because this non-discrimination section was added after Section 1182(f), Congress intended that it supersede Section 1182(f) to the extent the two sections conflict. Plaintiffs argue in support of this position that, historically, presidents have used Section 1182(f) only to prohibit the issuance of visas to classes of applicants that are not subject to Section 1152. *See* Pls.' Mot. 27–28. Plaintiffs also contend that because, when applicable, Section 1152(a) applies to any assessment of the terrorism related grounds for inadmissibility under Section 1182(a)(3)(B), Section 1152(a)'s non-discrimination restrictions must also be read to apply to the President's exercise of authority under Sections 1182(f) and 1185(a), at least in so far as that authority is exercised to bar entry based on terrorism concerns. For all

these reasons, Plaintiffs claim that Congress foreclosed the President's ability to make national security determinations on the basis of criteria prohibited under Section 1152.

In response to Plaintiffs' position, Defendants see presidential authority and authorizations in Sections 1182(f) and 1185(a) unaffected by Section 1152 and contend that the President's authority under those sections "comfortably encompass the Order's temporary suspension of entry of aliens from six countries." Defendant's Memorandum in Opposition to Plaintiffs' Motion [Doc. No. 22] ("Defs.' Mem. Opp'n") 17. They contend, in this regard, that Section 1185(a) was enacted after Section 1152 and that, in any event, Section 1152 prohibits discrimination only in the issuance of an *immigration*—not a *non-immigration*—visa "in the ordinary process of visas and admissions." *Id.* 18. Section 1152 "does not purport to, and has never been interpreted to restrict, the President's longstanding authority [under Sections 1182(f) or 1185(a)]." *Id.* Defendants further contend that since most of the aliens that Plaintiffs claim will be affected by EO-2—students, employees, tourists, refugees, and family—would seek to obtain *non*-immigrant visas, any limitations imposed by Section 1152 would not extend to the President's authority to bar entry of that class of aliens seeking non-immigration visas.

▮ In construing the proper scope of the President's statutory authority, the Court has reviewed the text and structure of the INA as a whole and, specifically, the practical, operational relationship each of the above referenced provisions has with the others. Based on that analysis, the Court concludes, at a minimum, that Section 1152's non-discrimination restrictions, which apply in connection with the issuance of immigrant visas, do not apply to the issuance or denial of non-immigrant visas or entry under Section 1182(f).[12]

▮ The Court also has substantial doubts that Section 1152 can be reasonably read to impose any restrictions on the President's exercise of his authority under Sections 1182(f) or 1185(a). Under those sections, the President has unqualified authority to bar physical entry to the United States at the border. Sections 1182(f) and 1152(a) deal with different aspects of the immigration process, and Section 1201(h) makes clear that while clearly related, the process of issuing a visa, and the rules and regulations related thereto, involves an aspect of the immigration process that is separate and distinct from the process of actually permitting entry into the country. There is nothing in the legislative scheme to suggest that Congress intended Section 1152 to restrict the exercise of the President's unqualified authority under Section 1182(f) with respect to a completely distinct aspect of the immigration process. To do so would appear to make Section 1201(h) all but meaningless. Likewise, the Court sees little merit to Plaintiffs' argument that because there are specific grounds for inadmissibility in Section 1182(a)(3)(B) based on terrorist activities, the President is foreclosed from barring entry of "aliens or classes of aliens" under Section 1182(f) based on national security concerns related to terrorism. Nothing in the text of Section 1182(a)(3)(B) or any other provision of the INA suggests that an alien may be barred from entering the

**12.** The District of Maryland court attempted to reconcile these seemingly contradictory provisions of the INA in *International Refugee Assistance Project*. There, the court concluded that Section 1152 bars the President from discriminating on the basis of nationality in the issuance of immigrant visas only. *Int'l Refugee Assist. Proj.*, 241 F.Supp.3d at 555–56, 2017 WL 1018235, at *10.

United States on terrorism grounds only through the regular visa application process. This provision simply provides grounds that establish *per se* ineligibility to receive a visa or to be admitted into the country. It also shows that Congress knows how to make a provision applicable to both the visa decision and the entry decision when it so in tends and that the two aspects of immigration are distinct. *See* 8 U.S.C. § 1182(a) ("Except as otherwise provided in this chapter, aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States . . . .").

For the above reasons, the Court cannot say at this point in the litigation that Plaintiffs have clearly shown that the President's authority under Sections 1182(f) and 1185(a) is limited by Section 1152 with respect to either immigrant or non-immigrant visas. Plaintiffs have therefore not demonstrated that they are likely to succeed on the merits of their INA statutory claim even if EO–2 discriminates on the basis of nationality (Count IV).

**2. Plaintiffs' Claim that EO–2 Constitutes Unlawful Agency Action Under the Administrative Procedures Act (Count III)**

 Plaintiffs claim that the issuance of EO–2 violates the Administrative Procedures Act ("APA"), 5. U.S.C. §§ 701–706 (2012). Although the APA defines an "agency" broadly to include "each authority of the Government of the United States, whether or not it is within or subject to review by another agency," 5 U.S.C. § 701,

this definition is not broad enough to include the Office of the President. The Supreme Court has explicitly found that "the President's actions [a]re not reviewable under the APA, because the President is not an 'agency' within the meaning of the APA." *Dalton v. Specter,* 511 U.S. 462, 469, 114 S.Ct. 1719, 128 L.Ed.2d 497 (1994); *see also Franklin v. Massachusetts,* 505 U.S. 788, 800–01, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992) ("Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the APA."). Accordingly, because President Trump's issuance of EO–2 is not reviewable under the APA, Plaintiffs have not demonstrated that they are likely to succeed on the merits as to their unlawful agency action claim (Count III).

**3. Plaintiffs' Claim that EO–2 Violates the Establishment Clause (Count I)**

 Plaintiffs also allege that EO–2 violates the Establishment Clause because it disfavors the religion of Islam.[13] The First Amendment prohibits any "law respecting an establishment of religion," U.S. Const. amend. I, and "mandates governmental neutrality between religion and religion, and between religion and nonreligion." *Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). If an act is discriminatory on its face, than it will be subject to strict scrutiny. *Larson v. Valente,* 456 U.S. 228, 246, 255, 102 S.Ct.

---

**13.** As a threshold matter, there remain open issues concerning to what extent recognized Establishment Clause principles and prohibitions developed over time with respect to domestic government conduct transfer seamlessly in application to restrict government conduct touching upon national security matters, including immigration and the treatment of aliens with no claim to citizenship or other immigration benefits. Nevertheless, for the purpose of this Motion, and because the Plaintiffs invoke the Establishment Clause based on their personal status as U.S. citizens or as lawful residents of the United States, the Court assumes, without deciding, that the President's exercise of his authority to issue EO–2 is circumscribed by settled Establishment Clause principles.

1673, 72 L.Ed.2d 33 (1982). If it is not discriminatory on its face, then courts typically apply a three-part test articulated in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) to determine whether the act violates the Establishment Clause.[14]

■ The text of EO–2, unlike that of EO–1, makes no mention of religion as a criterion for benefits or burdens. Nevertheless, Plaintiffs maintained at the hearing that EO–2, section 1(f), which articulates President Trump's rationale behind the Order, is nevertheless discriminatory on its face because the national security risk referenced to justify EO–2 in that section is demonstrably false and EO–2's plain language therefore betrays the Order's discriminatory intent.

As an initial matter, and as Plaintiffs concede in their brief, the language of EO–2 is facially neutral. *See* Pls' Mot. 5 ("[EO–2] creates a framework that although neutral on its face, carries through the same invidious intent insofar it essentially seeks to preserve a portion of the First Muslim Ban [EO–1]."). To be facially neutral simply means that there is no discrimination in "that which is shown by the mere language employed, without any explanation, modification, or addition from extrinsic facts or evidence." *Face, Black's Law Dictionary* (10th ed. 2014). Discrimination based on religion cannot be inferred from the language EO–2 employs. EO–2 draws no "explicit and deliberate distinctions" based on religion. *See Larson v. Valente*, 456 U.S. 228, 262, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982). Moreover, the Court sees no basis for the claim that EO–2's

stated and referenced justifications are "demonstrably false," and no inference of religious discrimination can be reasonably inferred from those justifications. EO–2 is therefore "facially neutral," and the Court applies the *Lemon* test to assess its constitutional validity under the Establishment Clause of the First Amendment.

■ Under the *Lemon* test, to withstand an Establishment Clause challenge, the government action (1) "must have a secular legislative purpose," (2) "its principal or primary effect must be one that neither advances nor inhibits religion," and (3) "the statute must not foster 'an excessive government entanglement with religion.'" *Lemon*, 403 U.S. at 612–13, 91 S.Ct. 2105 (quoting *Walz v. Tax Comm'n of City of N.Y.*, 397 U.S. 664, 668, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) (internal citation omitted). Plaintiffs do not contend that EO–2 fails to satisfy the second or third prongs of the *Lemon* test, and the Court only needs to consider whether EO–2 has a secular purpose.

EO–2 clearly has a stated secular purpose: the "protect[ion of United States] citizens from terrorist attacks, including those committed by foreign nationals." EO–2 § 1(a). It also details the overall policy and purpose for the Order. *See id.* ("The screening and vetting protocols and procedures associated with the visa-issuance process and the United States Refugee Admissions Program (USRAP) play a crucial role in detecting foreign nationals who may commit, aid, or support acts of terrorism and in preventing those individuals from entering the United States. It is therefore the policy of the United States to

---

14. There is one additional test to find a violation of the Establishment Clause, which has only once been invoked and is not relevant to this litigation. Regardless of whether a government action is facially neutral, that action will be found constitutional where there is "unambiguous and unbroken history" that unequivocally demonstrates the Framers' intent that the Establishment Clause not prohibit the government action. *Marsh v. Chambers*, 463 U.S. 783, 792, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) (finding the opening of congressional session with a prayer constitutional).

improve the screening and vetting protocols and procedures associated the visa-issuance process and the USRAP."); *id.* § 2(c) (explaining that the suspensions are needed "[t]o temporarily reduce investigative burdens on relevant agencies during the review period described in subsection (a) of this section, to ensure the proper review and maximum utilization of available resources for the screening and vetting of foreign nationals, to ensure that adequate standards are established to prevent infiltration by foreign terrorists, and in light of the national security concerns referenced in section 1 of this order"). The Court must therefore first determine to what extent and on what basis it will look behind the Order's stated secular purpose and justification to determine whether EO-2 constitutes a subterfuge or pretext for a true purpose of religious discrimination. The Plaintiffs contend in that regard that the Court must consider what they claim is a long and unbroken stream of anti-Muslim statements made by both candidate Trump and President Trump, as well as his close advisors, which, taken together, makes clear that EO-1 and EO-2 are nothing more than subterfuges for religious discrimination against Muslims. Defendants contend that given the clearly articulated secular purpose and national security related justifications in EO-2, the Court should not consider any such statements and end its inquiry at the text of EO-2.

■ In determining how to proceed, the Court is cast upon cross jurisprudential currents. On the one hand, this prong of the *Lemon* analysis "contemplates an inquiry into the subjective intentions of the government." *Mellen v. Bunting*, 327 F.3d 355, 372 (4th Cir. 2003). On the other hand, the Supreme Court has repeatedly cautioned that in the immigration context, a court should not "look behind the exercise of [Executive Branch] discretion" when exercised "on the basis of a facially legiti-

mate and bona fide reason." *Kleindienst v. Mandel*, 408 U.S. 753, 770, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972). In *Mandel*, the Supreme Court recognized that First Amendment rights were implicated in the government's denial of a visa to an invited foreign lecturer. Nevertheless, and even though the government did not attempt to justify that denial on national security grounds, the Supreme Court concluded that where the government has provided a facially legitimate and bona fide reason, "the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who [claim they are injured by the visa denial]." *Id.*; *see also Fiallo v. Bell*, 430 U.S. 787, 795, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) (confirming that a broad "policy choice" is to be reviewed under the same "standard...applied in[ ]*Mandel*"). As reflected in these rulings, a court must extend substantial deference to the government's facially legitimate and non-discriminatory stated purposes. *See, e.g., Appiah v. U.S. I.N.S.*, 202 F.3d 704, 710 (4th Cir. 2000) ("The reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the president in the area of immigration and naturalization." (quoting *Mathews v. Diaz*, 426 U.S. 67, 81–82, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976)).

Since *Mandel* and *Fiallo*, the Supreme Court has counseled that the focus of a district court's inquiry should be on whether the stated purpose "was an apparent sham, or the secular purpose secondary." *McCreary County, Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 865, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005) (While courts "often...accept governmental statements of purpose, in keeping with the respect owed in the first instance to such official claims,...in those unusual cases where the claim was an apparent sham, or

the secular purpose secondary, the unsurprising results have been findings of no adequate secular object."). It also directs that a court must develop an "an understanding of official objective... from readily discoverable fact, without any judicial psychoanalysis of a drafter's heart of hearts." *Id.* at 862, 125 S.Ct. 2722. Based on these principles, the Court rejects the Defendants' position that since President Trump has offered a legitimate, rational, and non-discriminatory purpose stated in EO–2, this Court must confine its analysis of the constitutional validity of EO–2 to the four corners of the Order. The Court has therefore carefully assessed President Trump's facially legitimate national security basis for EO–2 against the backdrop of all of the statements the President and his closest advisors have made.[15]

When this Court reviewed and enjoined EO–1, "the question [wa]s whether the [order] was animated by national security concerns at all." *Aziz,* 234 F.Supp.3d at 735, 2017 WL 580855, at *8 (Brinkema, J.). President Trump and his advisors made statements that allowed the inference that the President's purpose in exercising his authority under Section 1182(f) to issue EO–1 was to impose burdens wholesale on people who subscribe to the Islamic faith, *viz.,* a "Muslim Ban." That possible purpose was also reflected in the text and structure of EO–1, which contained language that, when considered in connection with public statements, sug-

gested that Christians would be given a benefit not available to Muslims. EO–2 is materially different in structure, text, and effect from EO–1 and has addressed the concerns raised not only by this Court but also by other courts that reviewed and enjoined EO–1. EO–2 was not rushed into immediate effect but, rather, was issued ten days before its effective date, permitting government bodies to better prepare for its effective implementation. It does not indefinitely suspend the entry of refugees from Syria, and it applies to all refugees, no matter where they are located. It does not direct that preference be given to any particular religion or group of religion over any other.

EO–2 also effectively excludes large categories of otherwise covered nationals from the relatively short suspension of any right to enter the United States. For example, section 3(a) limits the scope of section 2(c) to aliens who were not in the United States on the Order's effective date and who did not have a valid visa on that date or on the effective date of EO–1.[16] Under section 3(b), all of the · Plaintiffs involved in this litigation are exempted from the reach of the Order. Similarly, under section 12(c) and (d), all immigrant and non-immigrant visas issued before the issuance of EO–2, including those marked revoked or cancelled pursuant to EO–1, are valid and reinstated. EO–2 also contains multiple circumstances and catego-

---

15. These statements are recounted in detail in Plaintiffs' briefs and the opinions of those courts that have enjoined the enforcement of EO–1 and EO–2. *See Hawai'i v. Trump,* No. 1:17-cv-00050, 241 F.Supp.3d 1119, 1136–39, 2017 WL 1011673, at *13–15 (D. Haw. Mar. 15, 2017); *Int'l Refugee Assist. Proj. v. Trump,* No. 8:17-cv–00361–TDC, 241 F.Supp.3d 539, 546–48, 2017 WL 1018235, at *3–4 (D. Md. Mar. 16, 2017); *Aziz v. Trump,* No. 1:17-cv-116, 234 F.Supp.3d 724, 728–32, 2017 WL 580855, at *3–5 (E.D. Va. Feb. 13, 2017).

16. Other groups of aliens whose inclusion in the scope of EO–1 concerned the Ninth Circuit are similarly excluded from the scope of EO–2, including legal permanent residence, foreign nationals admitted to or paroled into the United States, foreign nationals granted asylum, refugees already admitted to the United States, and people granted particular forms of protection from removal. EO–2 § 3(b).

ries under which consular officials are permitted to grant case-specific waivers to coverage under section 2(c) or section 6(a).[17] EO–2 §§ 3(c), 6(c). Iraq is eliminated from the list of suspended countries because "the Iraqi government has expressly undertaken steps to enhance travel documentation, information sharing, and the return of Iraqi nationals subject to finals orders of removal" since President Trump issued EO–1. *Id.* § 4. Finally, a "Policy and Purpose" section has been added which provides an extensive justification for the Order on the basis of national security, including information specific to each of the six countries referenced in EO–2.[18] *Id.* § 1. And as stated above, EO–2 was also explicitly revised in response to judicial decisions that identified problematic aspects of EO–1 and invited revisions.[19]

Given the revisions in EO–2, the question is now whether the President's past statements continue to fatally infect what is facially a lawful exercise of presidential authority. In that regard, the Supreme Court has held that "past actions [do not] forever taint any effort on [the government's] part to deal with the subject matter.... District courts are fully capable of adjusting preliminary relief to take account of genuine changes in constitutionally significant conditions." *McCreary*, 545 U.S. at 848, 125 S.Ct. 2722. This Court is no longer faced with a facially discriminatory order coupled with contemporaneous statements suggesting discriminatory intent. And while the President and his advisors have continued to make statements following the issuance of EO–1 that have characterized or anticipated the nature of EO–2,[20] the Court cannot conclude for the purposes of the Motion that these statements, together with the President's past statements, have effectively disqualified him from exercising his lawful presidential authority under Section 1182(f). In other words, the substantive revisions reflected in EO–2 have reduced the probative value

---

**17.** This list includes, *inter alia*, foreign nationals previously "admitted to the United States for a continuous period of work, study, or other long-term activity" but who currently reside outside of the United States and seek to re-enter; those who seek entry for "significant business or professional obligations and the denial of entry would impair those obligations"; and those who seek entry "to visit or reside with a close family member (e.g., a spouse, child, or parent) who is a [U.S.] citizen, legal permanent resident, or alien lawfully admitted on a valid nonimmigrant visa." EO–2 § 3(c).

**18.** When it issued its stay of the district court's TRO of EO–1, the Ninth Circuit indicated it had invited President Trump to make the sorts of changes that he has now made in his reissuance of the Order. *See Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017) ("Despite the district court's and our own repeated invitations to explain the urgent need for the Executive Order to be placed immediately into effect, the Government submitted no evidence....").

**19.** As President Trump states in the Order, "I am revoking Executive Order 13769 and replacing it with this order, which expressly excludes from the suspensions categories of aliens that have prompted judicial concerns and which clarifies or refines the approach to certain other issues or categories of affected aliens." EO–2 § 1(i); *cf.* Order Denying Washington's Emergency Motion to Enforce the Preliminary Injunction, *Washington v. Trump*, No. C17–0141JLR, at 5–6, 2017 WL 462040 (W.D. Wash. Mar. 16, 2017), ECF No. 163. (noting significant differences between EO–1 and EO–2 in denying the plaintiffs' emergency motion to enforce the court's preliminary injunction of EO–1 against EO–2 on the grounds that EO–2 constituted the same conduct previously enjoined).

**20.** Among these are the President's reference to EO–2 as a "watered-down version" of EO–1, [*see* Doc. No. 28]; and Presidential Advisor Stephen Miller's statement that a revised executive order was "going to have the same basic policy outcome for the country" and that it would be issued "with mostly minor technical differences." Pls' Mot., Ex. Y.

of the President's statements to the point that it is no longer likely that Plaintiffs can succeed on their claim that the predominate purpose of EO–2 is to discriminate against Muslims based on their religion and that EO–2 is a pretext or a sham for that purpose. To proceed otherwise would thrust this Court into the realm of " 'look[ing] behind' the president's national security judgments...result[ing] in a trial *de novo* of the president's national security determinations," *Aziz*, 234 F.Supp.3d at 735, 2017 WL 580855, at *8, and would require "a psychoanalysis of a drafter's heart of hearts," all within the context of extending Establishment Clause jurisprudence to national security judgments in an unprecedented way.

For the above reasons, Plaintiffs have not made a clear showing that they are likely to succeed on the merits as to their Establishment Clause claim (Count I).

**4. Plaintiffs' Claim that EO–2 Violates the Equal Protection Clause (Count II)**

▮ Plaintiffs also contend that EO–2 violates the Equal Protection Clause of the First Amendment by targeting Muslims for distinctive treatment. The Equal Protection Clause provides that "[n]o State shall...deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.[21] It is undisputed that EO–2 has a differential impact on Muslims. According to Plaintiffs, "there are approximately 166 million people in these six countries, all of whom will be affected by the [Order], and 97 percent of whom are Muslim." Pls.' Mot. 23. Defendants do not dispute that the countries affected are overwhelmingly Muslim.

▮ "[A] law, neutral on its face and serving ends otherwise within the power of government to pursue, is not invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another." *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). This precept is particularly applicable in the area of immigration measures related to national security concerns. Relying on Supreme Court precedent, the Fourth Circuit has emphasized that where a particular immigration measure is facially neutral and has a rational national security basis that is "facially legitimate and bona fide," such a measure will survive an Equal Protection Clause challenge. *Rajah v. Mukasey*, 544 F.3d 427, 438 (2d Cir. 2008) (quoting *Romero v. INS*, 399 F.3d 109, 111 (2d Cir. 2005)). "Distinctions on the basis of nationality may be drawn in the immigration field by Congress or the Executive...[and must be upheld] [s]o long as [they] are not wholly irrational...." *Id.* (quoting *Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979)).

In *Rajah*, the Fourth Circuit rejected an Equal Protection Clause challenge to a program that required all non-permanent resident males over the age of sixteen from a group of countries that were, except for North Korea, predominantly Muslim to appear personally at government facilities for registration and fingerprinting and to present immigration related documents ("the Program"). Individuals who did not appear risked potential arrest. *Id.* at 433. The Fourth Circuit concluded that there was a rational national security basis for the special registration requirements because (1) the terrorist attacks of September 11, 2001 "were facilitated by the lax enforcement of immigration laws"; (2) "[t]he Program was designed to monitor more closely aliens from certain countries

---

21. Although the Clause only applies to state and local governments according to its text, the Supreme Court has held that it also applies to the federal government through the Due Process Clause of the Fifth Amendment. *See Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

selected on the basis of national security criteria"; and (3) the "Program was a plainly rational attempt to enhance national security." *Id.* at 438–39. Rejecting the plaintiffs' Equal Protection Clause challenge, the Fourth Circuit observed:

> To be sure, the Program did select countries that were, with the exception of North Korea, predominantly Muslim. Petitioners argue, without evidence other than that fact, that the Program was motivated by an improper animus toward Muslims. However, one major threat of terrorist attacks comes from radical Islamic groups. The Program was clearly tailored to those facts. It excluded males under 16 and females on the grounds that military age men are a greater security risk. Muslims from non-specified countries were not subject to registration. Aliens from the designated countries who were qualified to be permanent residents in the United States were exempted whether or not they were Muslims. The Program did not target only Muslims: non-Muslims from the designated countries were subject to registration. There is therefore no basis for petitioner's claim.

*Id.* at 439. Plaintiffs argue that EO–2 is suspect because it does not extend to other countries that pose greater terrorist threats, considering that there is no evidence that individuals who committed acts of terrorism in the United States have actually come from the designated countries. But the Fourth Circuit dispatched those sorts of arguments as well:

> Petitioners also challenge the Program based on their perception of its effectiveness and wisdom. They argue, among other things, that it has not succeeded in catching a terrorist. However, we have no way of knowing whether the Program's enhanced monitoring of aliens has disrupted or deterred attacks. In any event, such a consideration is irrelevant because an *ex ante* rather than an

*ex post* assessment of the Program is required under the rational basis test. *Id.* at 439.

EO–2 identified a broad range of conditions, circumstances, and conditions that raise "facially legitimate and bona fide" national security bases for the Order, including that each of the designated countries (1) has conditions that present "heightened risks"; (2) is a state sponsor of terrorism; (3) has been actively compromised by terrorist organizations; or (4) contains active combat zones. EO–2 § 2(d). The President sees in these circumstances conditions that "diminish[ ] the foreign government's willingness or ability to share or validate important information about individuals seeking travel to the United States," and "the significant presence in each of these countries of terrorist organizations, members, and others exposed to these organizations increases the chance that conditions will be exploited to enable terrorist operatives or sympathizers to travel to the United States." *Id.* § 1(d). Moreover, "once foreign nationals from these countries are admitted to the United States, it is often difficult to remove them, because many of these countries typically delayed issuing, or refuse to issue, travel documents." *Id.* EO–2 also identifies specific conditions in each designated country "that demonstrate why their nationals continue to present heightened risks to the security of the United States." *Id.* § 1(e). The President has concluded that "[i]n light of the conditions in these six countries, until the assessment of current screening and vetting procedures required by section 2 of this order is completed, the risk of erroneously permitting entry of a national of one of these countries who intends to commit terrorist acts or otherwise harming national security of the United States is unacceptably high." *Id.* § 1(f). These are judgments committed

to the political branches—not to the courts.

Moreover, as with the Program at issue in *Rajah*, EO–2 is similarly tailored to limit the scope of the temporary suspension. EO–2 contains limitations, exemptions, and waivers that undercut any inference that the purpose of the Order was to discriminate against Muslims because of their religion or nationality rather than national security concerns. Also as in *Rajah*, while the Order pertains to predominantly Muslin countries, it applies to any particular person equally, whether Muslim or non-Muslim. Overall, EO–2 identifies a rational security basis for its issuance at least as strong and explicit as that found sufficient in *Rajah*. Plaintiffs again argue that the stated justifications and revisions reflected in EO–2 cannot overcome the President's statements, including that EO–2 is a "watered-down" version of EO–1. But those statements do not eliminate the real substantive differences between the two orders, and for the reasons previously discussed within the context of Plaintiffs' Establishment Clause challenge, those statements are insufficient for the Court to conclude that the Plaintiffs have clearly shown that they will likely succeed on their Equal Protection Clause challenge in Count III.

## C. Irreparable Harm in the Absence of Preliminary Relief

 The Fourth Circuit has held that, as a matter of law, "loss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 520–21 (4th Cir. 2002) (quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *see also Aziz v. Trump*, No. 1:17-cv-116 (LMB/TCB), 234 F.Supp.3d 724, 737–38, 2017 WL 580855, at *10 (E.D. Va. Feb. 13, 2017). These Plaintiffs allege violations of the Establishment Clause of the First Amendment of the United States Constitution in Count I, *see* AC ¶¶ 87–97, as well as various other forms of irreparable harm including (1) inability to arrange visits from foreign relatives, (2) more stringent review of spousal marriage petitions, and (3) more stringent review of a visa application. Without ruling specifically on these claims of irreparable harm, the Court finds it sufficient that Plaintiffs' First Amendment rights are implicated in EO–2; and Plaintiffs should therefore not be denied injunctive relief based on the lack of irreparable harm.

## D. Balance of Equities

 In order to obtain the requested injunction, plaintiffs must establish, separately from any showing of irreparable harm, that the "balance of equities" weighs in their favor. In determining whether plaintiffs have made that showing, "[i]n each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24, 129 S.Ct. 365 (quoting *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)).

 Plaintiffs argue that EO–2 has inflicted five different categories of harm on them: it (1) may prevent them from reuniting with their foreign national spouses due to EO–2's heightened standard of review of marriage applications and visas; (2) may prevent them from renewing their own visas because those visas will be subject to a heightened standard of review; (3) may prevent them from traveling internationally out of their fear that they may somehow forfeit their own visas by doing so; (4) has imposed a stigma on the American Muslim community of which they are a part; and (5) has required them to devote their time and attention to publicly

advocating on behalf of the American Muslim community.

All of these alleged harms are either speculative or were already experienced before or independently of EO–1 or EO–2. For example, with respect to the harms alleged in category 1, Plaintiffs claim that their marriage petitions filed on behalf of their spouses or their relatives' visas will either be delayed in processing or subject to new, never before imposed, heightened standards of scrutiny. In support of that claim, they point to section 3(c) of EO–2, which provides consular officials with the discretion to issue individual waivers "if the foreign national has demonstrated to the officer's satisfaction that denying entry during the suspension period would cause undue hardship, and that his or her entry would not pose a threat to national security and would be in the national interest," as well as section 4, which subjects nationals of Iraq to "thorough review," and section 5, which directs various agencies within the executive branch to implement a uniform screening and vetting procedure for screening all individuals who seek to enter the United States. Yet, as reflected in a State Department Alert issued on March 6, 2017, visa application appointments continue to be held. *See* Defs.' Mem. Opp'n 12. Defendants have further represented that currently, while the enforcement of EO–2 has been enjoined by other Courts, applications are being reviewed in substantially the same way as before the issuance of either EO–1 or EO–2. In fact, on March 21, 2017, Plaintiff John Doe No. 6 "advise[d] the Court that his marriage petition that he filed for his wife was approved, and her visa application is currently pending." [Doc. No. 31.] In short, there is no evidence that relevant visa applications have been processed, delayed, or denied in any meaningfully different way than before the issuance of EO–1 and EO–2.

Similarly speculative are the harms claimed in categories 2 and 3, based on certain of the Plaintiffs' currently held visas and their immigration status. For example, Plaintiffs John Doe Nos. 2 and 3, who have valid F–1 student visas, allege that EO–2's interferes with their ability to travel. But these Plaintiffs are in a category expressly exempted from the temporary ban of the Order. In that regard, section 3(a) provides that "the suspension of entry…shall apply only to foreign nationals of the designated countries who: (i) are outside the United States on the effective date of this order; (ii) did not have a valid visa at 5:00 p.m., eastern standard time on January 27, 2017; and (iii) do not have a valid visa on the effective date of this order." EO–2 § 3(a). Plaintiffs John Doe Nos. 2 and 3 were inside the United States on the effective date of the Order and had valid F–1 visas both as of January 27, 2017 and as of March 16, 2017, the effective date of the Order. They are therefore exempt from EO–2's temporary suspension of entry, and it is completely speculative whether these Plaintiffs would experience any harm as a result of EO–2 were they to travel within the United States or internationally.

Finally, with respect to the harms included in categories 4 and 5, certain Plaintiffs claim that they are being harmed by EO–2 because they are "prominent civil rights activists…[who have been forced] to spend a significant amount of their time…assisting and advocating on behalf of Muslims targeted by th[e] order and pushing back against the anti-Muslim sentiment that Defendants have fomented and legitimized through their actions."[22] These individuals have engaged in these activities in connection with their chosen calling and

22. Def.'s Mot. 15.

careers and were engaged in similar civil rights activities before and independently of the issuance of EO–2. Likewise, the stigma Plaintiffs have felt, judging by their description, emanated before either executive order issued; and while those feelings of stigma are undoubtedly legally cognizable injuries and may have been deepened with the issuance of the executive orders, they were primarily experienced separate and apart from the issuance of the orders and will not be cured if the Court were to grant the Motion. Therefore, any stigma that was in fact caused by the orders cannot be materially undone or redressed at this point beyond what has already been effected through the injunctions already issued by other district courts.

In contrast to the speculative and abstract hardships that Plaintiffs may experience in the absence of immediate relief, "the Government's interest in combating terrorism is an urgent objective of the highest order." *Holder v. Humanitarian Law Project,* 561 U.S. 1, 28, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010). In EO–1, the President did "little more than reiterate that fact" and "submitted no evidence" to demonstrate the need for immediate action. *Washington v. Trump,* 847 F.3d 1151, 1165–66 (9th Cir. 2017). However, in EO–2, the President has provided a detailed justification for the Order based on national security needs, and enjoining the operation of EO–2 would interfere with the President's unique constitutional responsibilities to conduct international relations, provide for the national defense, and secure the nation. On balance, Plaintiffs have not established that the equities tip in their favor.

**E. Public Interest**

 Plaintiffs must also establish that the issuance of an injunction is in the public interest. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter,* 555 U.S. at 24, 129 S.Ct. 365 (quoting *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982)) (internal quotation marks omitted). Based on the record now before the Court, the parties' respective interests described above, the subject matter of EO–2, and the protections to the public that EO–2 is intended to provide, Plaintiffs have not established that the public interest favors issuance of immediate relief in this action.

**IV. CONCLUSION**

For the above reasons, Plaintiffs have not established that (1) they are likely to succeed on the merits of their case, (2) the balance of hardships tips in their favor, or (3) immediate relief would be in the public interest. Accordingly, they have not established that they are entitled to obtain the extraordinary remedy of an injunction enjoining the enforcement of EO–2. Plaintiffs' Motion is therefore denied.

The Court will issue an appropriate order.